BARNES, J.,
 

 for the Court.
 

 ¶ 1. Thomas Dorsey Campbell appeals the judgment of the Chancery Court of Lamar County, which denied his petition to terminate his conservatorship. Finding no error, we affirm.
 

 STATEMENT OF FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. In 1985, Campbell suffered a serious brain injury from an on-the-job accident, when he fell approximately thirty feet onto a concrete floor after inhaling hydrogen sulfide. He was declared mentally incompetent, and his father established a conser-vatorship for him in 1986. In 1988, Campbell received a settlement of over $2,000,000 for the accident. AmSouth Bank, then operating as Deposit Guaranty National Bank, was appointed the conservator of Campbell’s estate.
 

 ¶3. In 2002, the chancery court terminated the conservatorship over Campbell’s “person,” but not over his estate. Campbell filed a petition to terminate the con-servatorship over his estate in February 2005. Attached to his petition were two physicians’ evaluations performed three years earlier in 2002, by Drs. Michael Lowry and Keith McLarnan. Dr. Lowry’s letter explained that Campbell was a former patient, and in the months and years following Campbell’s injury, Dr. Lowry had found Campbell incompetent and in need of a conservator to manage his affairs. However, Campbell had progressed well over the past ten years — acquiring a GED, starting a family, and earning a degree from a community college. Dr. Lowry concluded that, from his standpoint, Campbell seemed competent to manage his financial affairs. Dr. McLarnan’s report stated Campbell has post-traumatic seizure disorder, but “[bjarring any personality disturbance disorders unknown to this examiner, the patient appears to be competent.” Dr. McLarnan’s report did acknowledge that Campbell had told him he had been trying to get control of his compensatory award since 1995. He had seen multiple doctors, all of whom, Campbell claims, found him to be competent.
 
 [1]
 
 Thus, Dr. McLarnan concluded in his report “why the patient is in this examiner’s office is not clearly understood ... having never seen the patient before.”
 

 ¶4. Three months after Campbell filed his petition to terminate in May 2005, the chancery court approved the withdrawal of $10,000 from Campbell’s estate, as he had been charged with possession of a controlled substance, and it was necessary for him to retain legal counsel for his criminal defense.
 

 ¶ 5. In March 2007, a hearing was held in the Lamar County Chancery Court on Campbell’s petition to terminate his con-servatorship. Present and testifying were Campbell, his attorney of record at the time, and his guardian ad litem, Nathan Farmer. Three documents were entered
 
 *472
 
 into evidence: a neuropsychology evaluation by Dr. Andrew Dickson, Ph.D., dated November 20, 2006; a letter from Farmer, dated June 8, 2006; and an AmSouth account statement of Campbell’s conserva-torship from July through September 2006, which reflected an ending market value of $344,231.94.
 

 ¶ 6. Dr. Dickson, a psychologist, provided a more recent medical evaluation than the ones which were on file, upon the direction of Farmer. His report dated November 2006 recommended that Campbell complete an Alcoholics Anonymous (AA) treatment program, and once that was completed, he saw no reason why Campbell would not have the cognitive capacity to manage his own money.
 
 [2]
 
 Campbell’s wife, who accompanied him to Dr. Dickson’s clinical interview, denied Campbell had any cognitive problems, as did Campbell himself. In his report, however, Dr. Dickson concluded that Campbell’s “denial” of cognitive problems, depression, and anxiety was “a bit disquieting.” Dr. Dickson also remarked that Campbell stated, regarding his settlement, that “they” were afraid that he would spend his money. Dr. Dickson reported that the “configuration of validity scales was suggestive of someone who is trying to ‘look good.’ ” Dr. Dickson concluded, however, that “if [an] attorney can produce in vivo evidence of emotional stability, (for example, no legal involvement, paying bills on time), then this would attest to his emotional stability.”
 

 ¶ 7. In his letter to the chancellor, Farmer reported that it was his opinion Campbell had sufficient knowledge and was competent enough to handle his finances. At the hearing, Farmer testified that Campbell has been taking some banking and finance courses at a local community college and had good grades; also Campbell understands what money is and how to make change. Regarding his employment history, Campbell has followed blueprints, fixed electrical systems, and done various remodeling work.
 

 ¶ 8. Campbell, testifying on his own behalf, stated he felt confident that he could handle his own financial affairs. After the accident, it was his father who initially set up the guardianship. At the time, Campbell explained, he was not married. However, in 1995 he married the mother of his daughter; the daughter was approximately three years old at the time they married. He also has a step-daughter. The chancellor, noting that this was the third or fourth time that Campbell had appeared before him trying to terminate his guardianship, asked Campbell what had changed since the prior attempts to terminate the guardianship. Campbell responded, “I’ve got more sense than most people out there.” The chancellor noted Campbell had been “in trouble with the law” since the last attempt to terminate. Campbell’s lawyer, however, explained that Campbell entered a “best interest plea.” Campbell’s counsel maintained that the drugs, which were found in the toolbox of Campbell’s truck, did not belong to Campbell, and because of some “problems with the evidence,” the case was nonadjudicated.
 

 ¶ 9. The chancellor proceeded to ask Campbell questions about Campbell’s relationship with his father. In the past, the chancellor pointed out Campbell’s father had not thought it wise to terminate the guardianship. Regarding his monthly income through the conservatorship, Campbell testified he receives $3,500 from the AmSouth account. In addition, he receives approximately $1,161 in monthly so
 
 *473
 
 cial security disability benefits. Furthermore, the insurance company owes future payments totaling approximately $800,000. Campbell testified that every four years, until 2028, he will receive “a big chunk of money” from this source. The chancellor concluded by expressing his main concern to Campbell: “how can we be assured that you’re not going to waste your money?”
 

 ¶ 10. In May 2007, the chancellor entered an order denying Campbell’s petition to terminate his guardianship, stating:
 

 The evidence in this matter does not convince the Court that ... Campbell possesses the requisite ability and capacity to manage his estate and financial affairs. The ward has a history of dissipating his estate and the monies that are allotted to him for monthly living expenses. While the Guardian Ad Li-tem and a medical expert have concluded that he is mentally able to make everyday decisions that are necessary for functioning as an independent adult (to which this Court still has serious reservations), this does not mean that he is fiscally and financially responsible.
 

 The ward also recently engaged in unlawful conduct which led to the expenditure of $10,000 for legal fees. This occurred within the previous year, and raises serious questions about the ward’s ability to handle his own financial affairs.
 

 From this judgment, Campbell now appeals. We note that the Appellees did not file a brief, and there has been no entry of appearance by an attorney on their behalf. The Mississippi Supreme Court has held that failure of the appellee to file a brief “is tantamount to confession of error and will be accepted as such unless the reviewing court can say with confidence, after considering the record and brief of appealing party, that there was no error.”
 
 Reddell v. Redded,
 
 696 So.2d 287, 288 (Miss. 1997). The Mississippi Supreme Court has also held that “[ajutomatic reversal is not required where the appellee fails to file a brief.”
 
 Selman v. Selman,
 
 722 So.2d 547, 551(¶ 13) (Miss.1998). With these precepts in mind, we consider the merits of Campbell’s argument.
 

 DISCUSSION
 

 ¶ 11. Campbell contends that there was no evidence introduced at the hearing supporting the position that he remains incompetent to handle his own affairs. The guardian ad litem, Farmer, testified that he reviewed the reports of Drs. Lowry, McLarnan, and Dickson. Campbell points out all three consultants and Farmer took the position that he is competent to handle his financial affairs without a conservator-ship.
 

 ¶ 12. Our standard of review in this case is important and limited. When reviewing decisions by a chancellor, we will not disturb his findings of fact unless they are manifestly wrong or clearly erroneous.
 
 In re Bardwell,
 
 849 So.2d 1240, 1245(¶ 16) (Miss.2003). If there is substantial evidence in the record to support the chancellor’s findings, those findings must be affirmed.
 
 Id.
 
 However, this Court may reverse a decree of a chancellor if his decision appears to be manifestly wrong.
 
 Harvey v. Meador,
 
 459 So.2d 288, 293 (Miss.1984).
 

 ¶ 13. A conservatorship may be granted for reasons associated with advanced age, physical incapacity, or mental weakness if a person “is incapable of managing his own estate.” Miss.Code Ann. § 93-13-251 (Rev.2004). The process of establishing a conservatorship is well established. The chancery court shall conduct a hearing to determine whether a conservator is needed. Miss.Code Ann. § 93-13-255 (Rev. 2004). At its discretion, the court may appoint a guardian ad litem who repre
 
 *474
 
 sents the interest of the person in question and will be present at the hearing. The chancellor “shall be the judge of the number and character of the witnesses and proof’ presented; however, there shall be at least two physicians, or a physician and a psychologist, each of whom shall make a personal examination of the person and file a written report of the results. These persons may also testify at the hearing.
 
 Id.
 

 ¶ 14. In
 
 Harvey,
 
 the supreme court noted that conservatorship statutes have broadened the definition of persons for whom assistance may be afforded by the court.
 
 Harvey,
 
 459 So.2d at 291. A declaration of non compos mentis is no longer necessary for establishing a conservator-ship; this procedure is intended to “encompass a broader class of people than just the incompetent.”
 
 Id.
 
 at 291-92. In articulating the standard for establishing a conservatorship,
 
 Harvey
 
 states:
 

 Mental weakness, as opposed to the more strict application of mental incompetency, is another statutory standard which also employs some vagueness. Mere lack of good business judgment, not amounting to some degree of wasted or dissipated property, is not a sufficient standard.
 
 Mental weakness which renders the subject incapable of understanding and acting within discretion in the ordinary affairs of life is sufficient.
 

 Harvey,
 
 459 So.2d at 292 (citation omitted) (emphasis added). The
 
 Harvey
 
 court goes on to adopt a “management competency test” to determine whether a conservator should be appointed. Factors to consider are: “ability to manage, or improvident disposition, or dissipation of property, or susceptibility to influence or deception by others, or other similar factors.”
 
 Id.
 

 ¶ 15. It is also well established that chancellors are the “superior guardians” over persons with disabilities and must take all necessary steps to conserve and protect the best interest of the wards of the court.
 
 Bardwell,
 
 849 So.2d at 1248(¶ 24) (citing
 
 Union Chevrolet Co. v. Arrington,
 
 162 Miss. 816, 826, 138 So. 593, 595 (1932)). Once the conservatorship is established, the chancellor will have discretion in determining whether a ward under a conservatorship shall have an allowance and, if so, how much.
 
 In re Conservatorship of Stallings,
 
 523 So.2d 49, 53 (Miss. 1988). This is because, unlike wards of the court who have been declared non compos mentis, wards under conservatorship may have the mental ability to manage a limited monthly income.
 
 Id.
 
 at 52. Thus, as articulated in
 
 Stallings:
 

 [competency is not an either/or. In considering whether a conservatorship should be established, the Chancery Court is inevitably in the relative world of shades of gray. Some persons are so incapable of handling their affairs that a conservator must be charged to do everything. Yet there are many circumstances where it is neither necessary nor desirable....
 

 Id.
 
 at 53.
 

 ¶ 16. We find these same considerations and factors apply in the decision whether or not to terminate a conservator-ship. In Campbell’s case, while there is evidence in the record that Campbell may be competent to handle his financial affairs, namely, the three reports (two from 2002 and one from 2006) and Farmer’s recommendation, there are certain red flags regarding Campbell’s behavior that may indicate he does not have the mental fortitude to “act within discretion in the ordinary affairs of life.” The chancellor apparently took these into account, and we cannot say he erred in doing so.
 

 ¶ 17. Of foremost concern are Campbell’s criminal legal issues after he filed his petition. Even though the drug charge
 
 *475
 
 was “nonadjudicated” and Campbell claims the drugs were not his, this incident, at the very least, shows his ability to be influenced by others, because the drugs were in the toolbox of his truck. At the most, it may also be indicative of a more serious drug problem. The incident cost him $10,000 in legal fees. Apparently, this was not the first time Campbell had been involved with drugs or alcohol, as Dr. Dickson noted in 1997 that Campbell had completed an AA treatment program, and in 2006 he recommended Campbell complete another program.
 
 [3]
 

 ¶ 18. Moreover, the three doctors’ reports, while ultimately concluding that Campbell was competent, were not free from evidence justifying continuation of the conservatorship. In 2002, Dr. McLar-nan reported that Campbell said he had been trying to get control of his compensatory award since 1995 and had been deemed competent by numerous doctors. If this was the case, Dr. McLarnan questioned why Campbell was in his office, as he had never treated him before and, thus, was not familiar with his case history. Additionally, he merely concluded Campbell was “competent” without elaborating. Dr. Lowry’s letter of 2002 was more specific, stating that after Campbell suffered “a significant brain injury many years ago,” he felt that he needed a conservator; however, he now found Campbell “competent to manage his financial affairs.” However, there were no test results or evaluations attached to Dr. Lowry’s letter, as there were with the other evaluations. Dr. Dickson’s 2006 report, the most recent and detailed, indicates Campbell’s absolute “denial” of problems was “disquieting” and indicative of someone who was trying to “look good.” Dr. Dickson qualified his opinion on Campbell’s cognitive capacity to handle his own financial affairs. He stated evidence in Campbell’s life of emotional stability would be proven by such things as lack of legal involvement, and this would attest to his competency. However, as discussed above, Campbell had actually suffered criminal “legal involvement” before this report was made and of which Dr. Dickson was apparently unaware.
 

 ¶ 19. The chancellor also noted in his order that Campbell has a history of “dissipating his estate and the monies that is allotted to him for monthly living expenses.” We note the record is replete with petitions, photographs, and subsequent orders from 2005 to expend funds from the conservatorship for the purpose of purchasing supplies for repairs and renovations to the Campbells’ home and swimming pool. We cannot say, on the record before us, whether this is part of the history of “dissipation” the chancellor refers to, as we only have the documents in the record since the time the petition to terminate was filed. However, there is no evidence to dispute the chancellor’s contention that assets have been dissipated. Furthermore, the chancellor stated in his order that he had serious reservations about whether Campbell was even functioning as an independent adult, which would certainly impact his ability to manage his finances. Finally, there is a lack of evidence presented from any family member or friend who might know Campbell well that he has the ability to manage his property and assets. Farmer’s statement at the hearing that Campbell knows what money is and how to make change is not indicative of fiscal responsibility.
 

 ¶ 20. While we commend Campbell for his educational endeavors in banking and
 
 *476
 
 finance at the community college and his recuperation from a serious brain injury, we are mindful that the issue of “competency” inhabits “the world of shades of gray.” We also recognize a chancellor’s foremost duty is to protect the best interests of the ward, and we find no evidence that the chancellor was motivated by any other purpose in his ruling. After applying the proper standard of deference to the chancellor’s findings, and after carefully examining the record, we cannot say he erred. This Court finds substantial evidence to support the chancellor’s denial of Campbell’s petition to terminate his con-servatorship. Accordingly, we affirm the judgment of Chancery Court of Lamar County.
 

 ¶ 21. THE JUDGMENT OF THE CHANCERY COURT OF LAMAR COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
 

 [1]
 

 . The record does not contain any prior physicians’ evaluations.
 

 [2]
 

 . Dr. Dickson also indicated that when he saw Campbell in 1997, Campbell had completed an AA program during that time period as well.
 

 [3]
 

 . We have no indication in the record whether Campbell completed this second AA program.